PHOENIX ASSUR. CO. OF LONDON v. FRANKLIN BRASS CO. OF BUCHANAN.

(Circuit Court of Appeals, Fourth Circuit. October 4, 1893.)

No. 44.

FIRE INSURANCE—CONDITIONS OF POLICY — BUILDER'S RISK — NOTICE OF COMPLETION—INCREASE OF RISK—TRIAL—INSTRUCTIONS.

A policy of fire insurance for a builder's risk on a factory and its machinery provided that assured, as soon as they were ready to begin manufacturing, should notify assurers, and the rate should be adjusted, and that the policy should be void if the premises were used so as to increase the risk. The disputed questions on the trial were whether the building was completed and the machinery used before the fire, so as to, avoid the policy. Held, that clear instructions should have been given' that an actual beginning of manufacturing, without notice, or readjust-! ment of the rate, would avoid the policy, and that a use or occupancy! beyond the ordinary hazard of builders' risks, and without notice, would! do likewise; leaving to the jury the questions whether there had been a! commencement of manufacturing without notice or readjustment, and' whether there had been an increase of the risk without notice or consent.'

In Error to the Circuit Court of the United States for the Western District of Virginia.

At Law. Action by the Franklin Brass Company of Buchanan, Va., against the Phoenix Assurance Company of London on a policy of fire insurance. Verdict and judgment for plaintiff. Defendant brings error. Reversed.

B. B. Munford and W. R. Staples, for plaintiff in error.

Thomas J. Kirkpatrick and R. G. H. Kean, for defendant in error.

Before GOFF, Circuit Judge, and HUGHES and MORRIS, District Judges.

HUGHES, District Judge. This is a suit for a loss by fire. The policy sued upon was taken out on the 25th June, 1891, in the sum of $7,333.33. It was one of several policies issued by insurers to assured on different properties. The properties insured by the policy which is the subject of this suit were a large frame building, and a small adjoining one, in the town of Buchanan, Va., that were in process of construction, and intended to be used in the manufacture of brass goods, and also a quantity of material and machinery deposited in the large building, which likewise was intended to be used when the manufacturing operations should commence. The large building and the machinery were burned.

The machinery insured was described in the policy as "engines,

boilers, machinery, belting, gearing, and all implements, appurtenances, and appliances, to be used in their business as manufacturers of brass goods, all contained in and on their premises," as described. The insurance was of the class called "builders' risks." The policy was taken out, nominally, for a year, but the terms were to be revised and readjusted whenever the assured should be ready to commence the business of manufacturing, a clause of the policy reciting, "It is understood that the above buildings are in course of construction, and privilege is hereby granted to complete the same;" another clause providing, "This company to be notified as soon as assured are ready to commence manufacturing, and rate to be adjusted." The policy also provided that it should be void "if the above-mentioned premises shall be occupied or used so as to increase the risk," "by any means whatever," "without notice to, and consent of, the insurer, in writing;" the insured being informed that the rate would be higher when manufacturing operations should commence.

The insurance, to the amount of $13,950 on the main building, and of $9,450 on machinery, having been thus procured, the assured proceeded with the erection of their buildings, and between the 25th of June and the last of July, 1891, the main building was completed, with the possible exception of a staircase and a gangway, and a considerable quantity of machinery brought to that building, and set up in it, preparatory to commencing the working operations.

In the latter part of July, 1891, the assured took out on its buildings and machinery six other policies, amounting to $51,000, in another company, permanent, and not of the class of builders' risks, which went into effect on the 1st of August ensuing. Assured do not seem to have given notice of these policies to the insurers. These policies are designated in the record as the "Otey Policies," the original policy on which this suit is brought having been negotiated by the insurance agency of Leftbridge & Davidge.

On the 27th August, a month after the procurement of the Otey policies, and shortly before the date of the fire which was the occasion of this suit, and which happened on the 4th September, 1891, the assured wrote to Leftbridge & Davidge, asking:

"Why have you not canceled the policies, which we told you to do August 1st, on our buildings here?"

Leftbridge & Davidge replied August 31st:

"We have received no instructions from you to cancel your policies on the buildings, &c., at Buchanan, which we took out in June last. If you desire us to cancel them, please return the policies, and we will do so without delay, and at the same time collect the return premiums due, and remit them to you."

Before the receipt of this letter, the assured again wrote to Messrs. Leftbridge & Davidge, saying:

"We are awaiting an answer to our letter of the 27th ulto., regarding the cancellation of our policies on our buildings in this place, which we told you to do when in New York, on the 1st of August."

To which letter, Messrs. Leftbridge & Davidge, under date of September 5th, replied:

"We are in receipt of your favor of the 3d inst. and note contents. Your favor of the 27th ulto. was duly received, and we herewith inclose a copy of our reply to the same. We can only add that, if you send forward the policies referred to, we will return them to the companies without delay, and remit you the return premiums."

Before the date of the fire, to wit, about the 27th of August, 1891, the Otey policies were, by direction of the companies, canceled, and thus were not in force at the time of the fire; but the assured had forthwith procured other policies of insurance in still another company, alike in character and purport to the Otey policies, some of which said new policies were in force at the time of the fire, from which the assured derived a partial indemnity.

After the procurement of the Otey policies, which, as has been seen, went into effect on the 1st day of August, 1891, the assured, without notifying the plaintiff in error, started fires in its furnaces, as early as the 4th day of August. By the 20th August, some ten or more operatives living in and around Buchanan were employed. The machinery was put in motion daily at the sounding of the whistle, at 7 o'clock in the morning. These operatives went to work, working until dinner time; then, after a short recess, worked until the factory closed for the night. They were paid off by the week. There is testimony tending to prove that at the time of the fire there were as many as 30 people employed in and about the factory. As many as 700 brass balls, which had been brought to the factory from the north in a partially completed state, were manufactured and sold upon order. Some thousands of brass hinges, one of the principal products of the works, were made, and only required to be polished in the buffing room—which was just about completed at the hour of the fire—to make them marketable goods. Several employes testify they had been working continuously day after day at the same presses, in the manufacture of the same class of goods, which presses were propelled by steam. While so engaged, the fire, which originated from the boiler, occurred, and the property was destroyed.

This fire occurred, as before stated, on the 4th of September, 1891, in the large building, in the daytime, the machinery being then set up and running. The fire originated at the boiler, and consumed the large building and its contents, embracing property mentioned in the policy. No notice had been given by the assured, either of an increase of risk from starting fires in the building that was burnt, or of readiness to commence manufacturing operations on or at any time after the 4th of August.

The foregoing narration embraces all the facts of the case, material to its decision.

The insurers contend that the lighting of the fires on or about the 4th of August, and the carrying on of manufacturing operations from that day until the occurrence of the fire, one month afterwards, was a double violation of the contract of insurance—First, in having been a commencement of manufacturing operations without

previous notice to them, and without a previous adjustment of the premium for a permanent, as distinguished from a builder's risk; and, second, in having been a violation of that stipulation of the policy under which they were entitled to notice of, and were to have the option of consenting to, any use of the premises which should increase their risk beyond the builder's risk.

The assured, on the other hand, insist that the use of fire and steam was necessary for the preparation and completion of this plant, and that such use in preparing and testing it for the commencement of manufacturing operations was a necessary incident of the risk insured against; whatever work that was necessarily incident to the completion of preparations having been implied by the contract, whether it increased the risk or not.

At the trial of the cause the court gave, among others, the following instruction to the jury, (third instruction prayed by the plaintiff below:)

"If the jury believe from the evidence that the main building of the plaintiff was not in fact completed when the loss occurred, and that at that time the plaintiff was not ready to commence manufacturing, and that the raising of steam in the boilers, and the running of such portions of the machinery as has been shown in evidence to have been run upon such work as it was suited to do, was in good faith intended as a test of the proper adjustment of the said machinery and tools used therewith, and was a proper mode of making such test, then the time had not arrived when, according to the terms of the typewritten portion of the policy sued on, it was incumbent on the plaintiff to notify the defendant that the plaintiff was ready to commence manufacturing, and the rate was to be adjusted; and the said policy, so far as said provisions are concerned, was in force at the time the loss occurred."

The court gave as its own the following instructions:

"However, if the jury believe from the evidence that the true intent and meaning of the policy sued on was not to insure the engines, boilers, and other machinery mentioned therein, in operation, but only to insure the same while the building was being constructed, and the machinery, etc., placed in position preparatory to commencing work, and that the plaintiff started fires in the furnaces, and used the engines, boilers, etc., without the permission of the defendant indorsed on the policy, and that thereby the risk was increased, then such acts were in violation of the terms of the policy, and the plaintiff is not entitled to recover in this action, and they should find for the defendant."

"And although the jury may believe that the engine, etc., were being used to test the machinery, with a view to getting it ready to commence manufacturing, still, if they believe that the policy did not cover the engine, boilers, etc., when they should be put in operation in the building, if the risk was thereby increased, they must find for the defendant."

The court refused to give, among others, the following (third and fourth) instructions prayed for by the defendants below.

"(3) The jury are instructed that by the terms of the policy the plaintiffs were prohibited from occupying or using the building described in said policy so as to increase the risk, or by any means whatsoever, within their control, from increasing such risk, without the assent of the defendants indorsed on said policy; and these provisions continued of binding force and effect, unless canceled by consent of the parties, or by notice given by plaintiffs to the defendants that they were ready to commence manufacturing, and a new rate actually adjusted. And if the jury believe that the risk was increased by lighting fires in the furnaces (in said building) previous to and at the time

of the fire which destroyed the building, and that this was done without the assent of the defendants indorsed on the policy, the plaintiffs are not entitled to recover in this case, although the jury may further believe that the plaintiffs, at the time of the fire, were not ready to commence manufacturing.

"(4) The jury are instructed that, according to the true intent and meaning of the policy, the plaintiffs were not entitled to manufacture goods for any purpose, if thereby they increased the risk, without notice to the defendants; and if the jury believe that the plaintiffs, by their agents, were engaged in manufacturing goods, previous to and at the time of the fire which destroyed the building, without such notice to the defendants, the jury must find for the defendants, whether the building was at the time of the fire completed, or not completed, or whether the plaintiffs were or were not in condition to complete and finish the goods which were in course of manufacture in said building."

Upon these instructions prayed for on either side and given or refused by the court, and other instructions on questions not involving the one under consideration, the case went to the jury, who 'found a verdict for the plaintiffs, assessing their damages at $6,933.-33. A motion for a new trial was made and refused, judgment was entered for the plaintiffs, and the case is here on a writ of error.

The insurers contend in their petition for the writ of error that the testimony showed that the assured had completed their preparations for commencing work as manufacturers by or before the 1st of August, and that this fact was practically conceded by their own conduct in effecting permanent insurances under what were termed the "Otey Policies," and those by which the Otey policies were replaced, and by directing the cancellation of all the builder's risk policies. They insist, therefore, that by the 4th August, when 'fires were lighted and the machinery set in motion, they were entitled to notice of readiness to commence work under the clause of the contract, entitling "this company to be notified as soon as the assured are ready to commence manufacturing, and the rate to be adjusted." They further contend that even if, in point of fact, the assured were not ready to commence work, yet, by lighting fires and putting the machinery in motion, and actually manufacturing goods, whether merely for testing the machinery or not, they increased the risk of fire, and that the insurers were not responsible for casualties, by reason of that clause of the contract which provided that "if the premises shall be occupied or used so as to increase the risk without notice to, or consent of, insurers, in writing, or the risk be increased by any means whatever, within the control of the assured, without the assent of the insurers," the policy should be void.

We think the court should have instructed the jury, in simple, positive terms, (1) that unless the insurers were previously notified of the readiness of the insured to commence manufacturing operations, and the rate of insurance adjusted and fixed, an actual commencement of the manufacturing of goods would release them; and (2) that during the period antecedent to readiness for commencing the work of manufacturing, if the assured so used or occupied the premises as to increase the risk of the insurers beyond the ordinary hazard of builders' risks, the latter would not be responsible for loss by fire, if their consent had not been given upon previous

notice; leaving it for the jury to decide, upon the questions of fact, first, whether there had before the fire been a commencement of manufacturing operations without notice of readiness to commence to the insurers, and without a readjustment of the rate; or, if not, whether there had been an increase of the risk of fire without notice to, or the consent of, the insurers.

The court erred in failing to give such instructions. We think it erred in giving the third instruction prayed for by the insured, which left the question, both of law and of fact, to the jury. We think it erred in giving the court's instruction, in which the court withheld its own interpretation of the contract, and left it to the jury as well to determine the legal purport of the contract as to ascertain the facts of the case. In the absence of other proper instructions covering the points involved, we think the court erred in refusing instructions third and fourth prayed for by the defendants below, which, we are of opinion, embodied the law of the case.

We have failed to find in the rulings of the court on the other points assigned as error anything of which the plaintiff in error can justly complain, but, for the reasons before stated, the judgment must be reversed, and the case remanded for a new trial.